IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD H. MCCULLOUGH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 17-407 |
| | ) | |
| v. | ) | |
| | ) | Judge Cathy Bissoon |
| ADVEST, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

**I.   MEMORANDUM**

Pending before the Court is a Motion to Dismiss filed by Defendants Advest, Inc., Bank of America, N.A., Robert Feldman, Merrill Lynch, and Pierce Fenner & Smith Incorporated (collectively, the "Defendants") (**Doc. 13**), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons that follow, Defendants' Motion to Dismiss (**Doc. 13**) will be GRANTED, Plaintiffs' federal claim (Count I) will be dismissed and the Court will decline to exercise supplemental jurisdiction over the remaining state law claims (Counts II through V).

**A.     BACKGROUND**

The Court writes principally for the parties, who are familiar with the factual context and legal history of this case.  Therefore, it will set forth only those allegations that are necessary to its analysis.

Plaintiffs commenced this lawsuit on February 4, 2011 by filing a writ of summons in the Court of Common Pleas of Allegheny County.  Thereafter, Defendants removed the case to federal court, and, in response to a motion to dismiss, Plaintiffs filed the operative Amended Complaint.  In their Amended Complaint, Plaintiffs allege that, between 2005 and 2007, Defendant Feldman, while employed by the corporate Defendants, used false representations to

1

induce Plaintiffs to purchase shares of two penny stocks, Telkonet, Inc. ("TKOI") and Geo Global Resources, Inc. ("GGR"), from which they suffered losses. (Am. Compl. (Doc. 10) ¶¶ 6-23, 30-36; see also Doc 10, Exhibit 1). Specifically, Plaintiffs allege as follows:

> 15. On or about March 17, 2005 and each succeeding date that Plaintiff purchased TKOI stock as set forth on Plaintiff's Exhibit 1, Feldman represented that TKOI would go to $14, then $40, then $70 and then $100 per share, depending on the need to induce a purchase or to allay fear and prevent liquidation of the position. Feldman's representations were not true as TKOI stock continued to fall in value after Plaintiff's initial purchase of the stock on March 17, 2005 at $4.31 per share.
>
> 16. On or about April 22, 2005 and each succeeding date that Plaintiff purchased TKOI stock as set forth on Plaintiff's Exhibit 1, Feldman represented that he had a business relationship with TKOI's CEO or Board of Trustees and had frequent meetings and communications with inside sources, often in Baltimore, who told him TKOI obtained enormous government contracts which would be announced soon or that the contracts could not be announced. Such representations were not true, as the CEO of TKOI later advised Plaintiff during early 2010 that Feldman never had a business relationship with the CEO or the Board of Trustees, that there had been no meetings or communications between Feldman and the CEO or other inside sources and that TKOI had no government contracts. The CEO of TKOI advised that he did not know Defendant Feldman and that Feldman was never a consultant for TKOI, contrary to Feldman's representations.
>
> 17. On or about August 11, 2005 and subsequent dates that Plaintiff purchased TKOI stock as set forth on Plaintiff's Exhibit 1, Feldman represented that TKOI entered into a contract with GE to remotely monitor all GE sub power stations, which contract was going to be announced on a particular date, always delayed. Defendant Feldman's representation in this regard was false, as the CEO of TKOI later advised during early 2010 that TKOI had no contract with GE.
>
> 18. On October 3, 2005 and subsequent dates that Plaintiff purchased TKOI stock, Feldman represented that the Department of Homeland Security was going to use TKOI technology at all major airports in the U.S. Defendant Feldman's representation was false as the CEO of TKOI later advised Plaintiff during early 2010 that TKOI did not have any government contract with the Department of Homeland Security to use TKOI technology at major airports.
>
> 19. On or about June 7, 2006 Feldman represented that TKOI could not keep up with orders and had a huge backlog of work. Feldman's representation was false, as Plaintiff later learned during early 2010 that in speaking with TKOI's CEO's assistant that there was no backlog of orders and that TKOI needed money to produce its product and run the company.
>
> 20. On or about May 18, 2007 Feldman represented that he owned a million shares of TKOI stock personally and that his family owned two million shares of stock when Plaintiff said he would sell. Feldman told him that to buy more TKOI shares because

2

Feldman controlled the float, meaning that Feldman and his personal customers were the only individuals to own shares outside of the company. This representation was false, as Plaintiff was later told by Feldman that the shorts on the TKOI stock were "killing us" which meant Feldman did not control the float and that other people not under his control were selling shares whereas he previously stated to Plaintiff that he controlled all shares. Feldman also stated that he owned a million shares of the stock, and, if the Plaintiff threatened to sell, that Feldman would just purchase more, often for family and friends, and that he could use the money he had made on the tremendous rise in the value to help cure a disease which afflicted his sick son.

21. On or about July 31, 2007 Feldman represented that TKOI stock would become worth 60-80 Million, that Feldman and his clients "controlled the float" and that once the shorts were cleared out they would dramatically increase the value of the stock. This representation was false as Plaintiff was later told by Feldman that the shorts on the TKOI stock were "killing us" which meant Feldman did not control the float and that other people not under his control were selling shares whereas he previously stated to Plaintiff that he controlled all shares.

22. On or about January 9, 2006, January 11, 2006, and March 8, 2006, and on numerous dates thereafter, Feldman represented that he had a close friend in the GGR office of the CEO, Jon Paul, and that the company had the largest discovery of oil and natural gas ever in the Indian Ocean. This representation was false as Plaintiff later learned during early 2010 from management of GGR that GGR did not have large discoveries of gas and oil in the Indian Ocean.

23. On September 12, 2007, October 5, 2007, and November 27, 2007, and a number of times thereafter, Feldman represented that GGR Company had enormous contracts with the Indian Government that would be announced, sometimes on particular dates, or that must be kept confidential if the dates passed. Feldman represented that the contracts could not yet be announced by GGR because the Indian Government either would not allow it or kept delaying permission. These representations were false, as Plaintiff later learned from GGR management during early 2010 that it had no contracts with the Indian Government to drill for oil.

24. Defendant Feldman kept Plaintiffs in these stocks by persistently repeating the above false representations and expanding on them with additional false representations and opinions, and by failing to disclose the significant risks and adverse and deteriorating business situation of these companies, which were not covered by the research departments of Advest, ML or BOA, in which manner he was able to maintain a large book of business from investors in the stocks, increasing his compensation when he sold his book of business or when ML acquired Advest and BOA acquired ML.

Defendants have filed a Motion to Dismiss for failure to state a claim (Doc. 13), arguing, *inter alia*, that Plaintiffs' federal securities law claim (Count 1) is time-barred. For the reasons discussed below, Defendants' Motion will be granted.

B.  **ANALYSIS**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When faced with a motion to dismiss, a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court may consult "the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir. 2004). Here, Defendants have attached to their Motion to Dismiss publicly available stock data and TKOI's and GGR's public SEC filings. (Doc. 14, Exhibits A-H). Although Plaintiffs argue that the Court cannot consider these documents, the Court of Appeals for the Third Circuit has clearly held that district courts may take judicial notice of these types of public records and consider them in resolving motions to dismiss. In re Merck & Co., Inc. Sec. Litig., 432 F.3d 261, 264 n.3 (3d Cir. 2005) ("We can take judicial notice of Merck's stock prices even on a motion to dismiss because these facts are not subject to reasonable dispute [and are] capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned"); In re NAHC Securities Litigation, 306 F.3d 1314, 1331 (3d Cir. 2002) (upholding lower court's decision to take judicial notice of "documents filed with the SEC, but not relied upon in the Complaint"); Pension Trust Fund for Operating Eng'rs v. Mortgage Asset Sec. Trans, Inc., 730 F.3d 263, 271 (3d Cir. 2013) (where "matters of public record and items appearing in the record of a case reveal that the claims . . . were untimely," a motion to dismiss is

proper). Accordingly, the Court will consider these documents in resolving Defendants' Motion to Dismiss.[1]

### 1. Plaintiffs' 10b-5 Claim is Time-Barred.

Defendants argue that Plaintiffs' 10b-5 claim is time barred. Plaintiffs' 10b-5 claim is governed by the statute of limitations found at 28 U.S.C. § 1658(b), Merck & Co. v. Reynolds, 559 U.S. 633, 638 (2010), which provides that a 10b-5 claim "may be brought no later than the earlier of . . . (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."

Defendants first argue that any alleged violations in the Amended Complaint that took place prior to February 4, 2006, including the alleged misrepresentations preceding Plaintiffs' first five purchases of TKOI and first two purchases of GGR, are barred by Section 1658(b)(2)'s five-year statute of repose. Plaintiffs respond that because Defendant Feldman allegedly repeated the misleading information several times after February 2006, their securities law claim is not barred by the statute of repose. Although the law in this area is somewhat unresolved, the majority of courts have held that the statute of repose in § 1658(b)(2) begins to run on the date of the last alleged misrepresentation regarding related subject matter. See N. Sound Capital LLC v. Merck & Co., 2015 WL 5055769, at *11 (D.N.J. Aug. 26, 2015) (citing CTS Corp. v. Waldburger, 134 S.Ct. 2175, 2182–83 (2014) ("A statute of repose . . . puts an outer limit on the right to bring a civil action. That limit is measured not from the date on which the claim accrues but instead *from the date of the last culpable act or omission of the defendant*.") (emphasis in original), *reversed on other grounds* in North Sound Capital, LLC v. Merck & Co., 2017 WL 3278886 (3d Cir. Aug. 2, 2017); In re Beacon Assocs. Litig., 282 F.R.D. 315, 324–25 (S.D.N.Y.

---

[1] However, as discussed in footnote 2 of this Order, even without consideration of these documents, the Court's analysis would be the same.

5

2012) (statute of repose first runs from the date of the last alleged misrepresentation regarding related subject matter); Quaak v. Dexia S.A., 357 F. Supp. 2d 330, 338 (D. Mass. 2005) (stating that "under Section 10(b), the statute of repose runs from the date of the last fraudulent misrepresentation" and finding actions occurring outside of the repose time-frame timely where they bore a sufficient nexus to the later filed financial statements); but see In re Juniper Networks, Inc. Securities Litigation, 542 F. Supp. 2d 1037, 1051 (N.D. Cal. 2008) (finding that the plaintiffs' §10(b) claim could not include any allegedly false statements made prior to the threshold date of the repose period). Following the weight of authority on this issue, the Court finds that the 5-year statute of repose began to run on the date of the last alleged misrepresentation, here, November 2007. Doc. 10 at ¶ 23. Accordingly, the Court finds that Plaintiffs' 10b-5 claim is not barred by § 1658(b)(2)'s five-year statute of repose.

Defendants next argue that Plaintiffs' securities fraud claim, as a whole, is time-barred pursuant to §1658(b)(1)'s bar on suits commenced "2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1). The Court agrees. Under the discovery standard, the statute of limitations "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation—*whichever comes first*." Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc., 730 F.3d 263, 276 n.6 (3d Cir. 2013) (citing Merck & Co. v. Reynolds, 559 U.S. 633 (2009) (emphasis in original)). Defendants here argue that Plaintiffs knew or should have known of the alleged securities violations well over two years before they initiated suit in February 2011. Defendants point to the substantial drop in the price of TKOI and GGR stock between 2005 and 2007, as well as SEC filings of TKOI and GGR that demonstrate that, as of 2007, TKOI was operating at a net loss, and GGR had not produced any oil or gas. (See Doc. 10, Exhibit 1; Doc.

14, Exhibits A-E). Defendants argue that inquiry notice of these "storm warnings" "would have prompted a reasonably diligent plaintiff to begin investigating," Merck, 559 U.S. at 653, but that Plaintiffs "do not allege that they exercised *any* diligence, undertook *any* investigation, or that they did *anything* in response to the collapse of the TKOI and GGR stocks (other than purchase more shares)." (Doc. 14 at 8) (emphasis in original).

Plaintiffs respond that, for inquiry notice to take hold, there must be some indicia of potential malfeasance. (Doc. 16 at 6-7 (citing In re Merck & Co., Inc. Securities, Derivative, & 'ERISA' Litigation, 543 F.3d 150, 166 (3d Cir. 2008) ("[T]o trigger storm warnings of culpable activity, in the context of a claim alleging falsely-held opinions or beliefs, investors must have sufficient information to suspect that the defendants engaged in culpable activity, *i.e.*, that they did not hold those opinions or beliefs in earnest.")). Plaintiffs argue that the "documents attached to Defendants' brief, the performance of the two stocks, the news articles and the 2007 SEC filings, do not contain any evidence of scienter by Defendant Feldman," and thus did not place Plaintiffs on inquiry notice of a potential securities law violation. (Doc. 16 at 11). Plaintiffs contend that they did not have evidence of scienter, *i.e.*, that Defendant Feldman knowingly made false representations to them, until early 2010, when they spoke with the CEO of TKOI and the management of GGR. (Doc. 16 at 8).

Notably, Plaintiffs do not respond to Defendants' assertion that they failed to conduct *any* investigation between 2007 (when they lost virtually all value in their investments) and early 2010 (when they spoke to the CEO of TKOI and the management of GGR). As Defendants' argue, their failure to do so is "fatal to their claim." Here, the public record clearly shows that Plaintiffs were on "inquiry notice" of numerous "storm warnings" related to their stock holdings

7

since at least the end of 2007.[2] Accordingly, they should have made *some* effort to investigate at that time. For instance, in light of the dramatic fall in stock prices between 2005 and 2007, Plaintiffs could have (and should have) investigated the veracity of Defendant Feldman's assurances that TKOI had entered into various contracts with the United States government and GE (Doc. 10 at ¶¶ 16-18), that GGR had "the largest discovery of oil and natural gas ever in the Indian Ocean," (id. at ¶ 22), and that GGR "had enormous contracts with the Indian Government" (id. at ¶ 23). Had Plaintiffs conducted some investigation into these verifiable facts, they surely would have discovered Defendant Feldman's alleged misrepresentations long before 2010. As the Third Circuit has recognized, where an investigation concerns a specific security or defendant—as is the case here—"there will usually be a smaller temporal disparity between the start of the investigation and the discovery of the facts constituting the violation." Pension Trust Fund, 730 F.3d at 275-76.

The relevant question, then, is "whether a comparable investigation would have been equally successful" in 2007, when Plaintiffs were placed on inquiry notice. Pension Trust Fund, 730 F.3d at 279. Here, Plaintiffs allege that they communicated with the CEO of TKOI and the management of GGR in 2010. The Court presumes that these communications did not happen serendipitously, but rather were initiated by Plaintiffs precisely because of the very storm warnings discussed above. Thus, based on the allegations in the Amended Complaint, there is no

---

[2] Notably, Plaintiffs' own records demonstrate these "storm warnings." (See Doc. 10, Exhibit 1). Specifically, the Exhibit attached to Plaintiffs' Amended Complaint shows that, from Plaintiffs' first purchase of TKOI shares on March 17, 2005 to their final purchase on December 31, 2007, the share price dropped from $4.31 per share to $0.80 per share, an 81% drop in stock price. Similarly, from Plaintiffs' first purchase of GGR shares on January 9, 2006 to their final purchase on November 27, 2007, the share price dropped from $10.14 per share to $3.17 per share, a 68% drop in stock price. Thus, even if the Court did not consider the public records attached to Defendants' Motion to Dismiss, it would still find, based solely on Plaintiffs' Amended Complaint and the attached Exhibit, that Plaintiffs were on inquiry notice at the end of 2007.

reason to believe that Plaintiffs could not have initiated their investigation earlier, or that an earlier investigation would not have yielded the same results in 2007 as it did 2010.

Because Plaintiffs should have known of Defendant Feldman's alleged misrepresentations over two years before they filed suit, their 10b-5 claim is time-barred. Accordingly, and because amendment of a time-barred claim would be futile, the Court will dismiss Plaintiff's 10b-5 claim with prejudice. See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008) ("[I]n the event a complaint fails to state a claim, unless amendment would be futile, the District Court must give the plaintiff the opportunity to amend her complaint.") (citing Shane v. Fauver, 213 F.3d 113, 116 (3d Cir. 2000)).

2. The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiffs' Remaining State Law Claims.

Having dismissed with prejudice the claim upon which federal jurisdiction rests (Count I), the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims (Counts II through V). See United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); see also Angeloni v. Diocese of Scranton, 135 F. App'x 510, 514 (3d Cir. 2005). This case is procedurally in the early stages. In this context, with the federal claim being dismissed, considerations of judicial economy, convenience, fairness and comity, do not weigh in favor of exercising supplemental jurisdiction over Plaintiffs' state law claims. Silverstein v. Percudani, 207 F. App'x 238, 240 (3d Cir. 2006) (citing Bright v. Westmoreland County, 443 F.3d 276, 286 (3d Cir. 2006)).

Accordingly, these claims will be dismissed without prejudice to Plaintiff refiling them in state court.[3]

## II. ORDER

For the reasons stated above, Defendants' Motion to Dismiss **(Doc. 13)** is GRANTED. Consistent with the foregoing, the Court hereby DISMISSES WITH PREJUDICE Count I of the Amended Complaint. The Court additionally DECLINES to exercise supplemental jurisdiction over Plaintiffs' state-law claims (Counts II through V), and will DISMISS those claims without prejudice to their refiling them in state court.

IT IS SO ORDERED.


August 25, 2017                                   s/Cathy Bissoon
                                                  Cathy Bissoon
                                                  United States District Judge

CC (via ECF email notification):

All Counsel of Record

---

[3] The Court notes, however, that although Plaintiffs may attempt to refile Counts II through V in state court, their chances of prevailing in any such litigation appear to the Court to be very low. Like Plaintiffs' federal securities act claim, Plaintiffs' Pennsylvania Securities Act claim (Count II) appears to be barred by the applicable one-year statute of limitations. 70 P.S. § 1-504(a) ("No action shall be maintained to enforce any liability created under section 5011 (or section 5032 in so far as it relates to that section) unless brought before . . . the expiration of one year after the plaintiff receives actual notice or upon the exercise of reasonable diligence should have known of the facts constituting the violation."). Likewise, Plaintiffs' state law tort claims (Counts III through V) almost certainly are barred by Pennsylvania's two-year statute of limitations. 42 Pa. C.S. § 5524; see also Cooper v. Sirota, 37 F. App'x 46, 48 (3d Cir. 2002) (negligent misrepresentation); Ciccarelli v. Gichner Sys. Grp., Inc., 862 F. Supp. 1293, 1301 (M.D. Pa. 1994) (fraudulent misrepresentation); In re Mushroom Transp. Co., Inc., 382 F.3d 325, 336 (3d Cir. 2004) (breach of fiduciary duty).